IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICHARD COHEN,<br>    Plaintiff,<br><br>    v.<br><br>RETAIL, WHOLESALE AND DEPARTMENT STORE INTERNATIONAL UNION AND INDUSTRY PENSION PLAN AND TRUSTEES OF THE RETAIL, WHOLESALE AND DEPARTMENT STORE INTERNATIONAL UNION AND INDUSTRY PENSION PLAN,<br>    Defendants. | CIVIL ACTION<br><br><br><br>NO. 18-1430 |

## MEMORANDUM OPINION

This case concerns Plaintiff Richard Cohen's eligibility for retirement benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"). Plaintiff claims that Defendants—the Retail, Wholesale and Department Store International Union and Industry Benefit and Pension Plan (the "Pension Plan" or "Plan") and the Plan's Board of Trustees (the "Board")—denied, first, his application for early retirement benefits, and, later, his application for normal retirement benefits in violation of various ERISA provision. Now pending are the parties' cross motions for summary judgment, both of which will be granted in part and denied in part for the following reasons.

### I. Legal Standard

Summary judgment must be granted to a moving party if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Alabama v. North Carolina*, 560 U.S. 330, 344 (2010). Material facts are determined by reference to the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). "This standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Auto–Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). "When both parties move for summary judgment, [t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id.* (internal quotation marks omitted).

## II. Background[1]

### A. The Parties & The Trust Agreement

Plaintiff is a Philadelphia resident who, for much of his adult life, worked as a bakery manager for Pathmark Stores, a subsidiary of The Great Atlantic & Pacific Tea Company Inc. ("A&P"). Throughout his approximately forty-six year tenure at Pathmark, Plaintiff was an active member of the Retail, Wholesale and Department Store Union ("RWDSU" or the "Union"), and, as a member, participated in the RWDSU Pension Plan.

The Plan provided various benefits to RWDSU members and their beneficiaries. Employers that employed RWDSU members contributed to the Plan in accordance with collective bargaining agreements ("CBAs") negotiated with local chapters of the Union. The Board, for its part, managed the Plan and its assets, including paying out beneficiaries to Plan participants.

The Plan was created by an Agreement and Declaration of Trust ("Trust Agreement"), several provisions of which are relevant here. First, the Trust Agreement provides that the Board: "shall have the full and exclusive right, power and authority, in its sole and absolute discretion, to determine all questions of the nature, type, form, commencement, amount and duration of benefits . . . to be provided to Covered Employees and their Beneficiaries." Second,

---
[1] The following facts are undisputed.

2

the Trust Agreement sets forth "the basis on which the eligibility for benefits and the nature, type, form, amount and duration of benefits shall be made," and contains two provisions that suspend retirement benefits for retirees that return to the workforce—one that applies to early retirement benefits and one that applies to normal retirement benefits (collectively the "reemployment suspension clauses").[2]

### B. Plaintiff Leaves Pathmark & Applies for Benefits

On July 19, 2015, A&P filed for bankruptcy and ceased making contributions to the Plan.[3] A&P's bankruptcy led to the closure or sale of all Pathmark stores. Plaintiff left his employment with Pathmark in August 2015, and, within a few weeks, was hired as an assistant bakery manager for Giant Supermarkets ("Giant") in Abington, Pennsylvania. Plaintiff's new role, however, paid less than his old job.

Accordingly, in August 2015, Plaintiff, then-aged sixty-three, applied to the Plan for early retirement benefits. In his application, Plaintiff indicated that he had left Pathmark and was

---

[2] In full, the Trust Agreement provides:

> Unless specifically waived by a decision of the Board of Trustees, the monthly benefit shall be suspended for any month in which the Participant is employed in Disqualifying Employment before he has attained Normal Retirement Age. "Disqualifying Employment," for the period before Normal Retirement Age is: (1) employment with any Employer contributing to the Fund; or (2) employment with any employer or self-employment in the same or related business in the same geographic area as any Employer contributing to the Fund; or (3) employment or self-employment in any business which is under the jurisdiction of the Union.

And:

> Unless suspension of benefits is specifically waived by a decision of the Board of Trustees, if the Participant has obtained Normal Retirement Age his monthly benefit shall be suspended for any month in which he worked or was paid for at least 40 hours in "Totally Disqualifying Employment," defined as employment (or self-employment) that is: (1) in an industry covered by the Plan when the Participant's pension payments began; and (2) in the jurisdiction of the Union when the Participant's pension began; and (3) in the same trade or craft or any occupation in which the Participant worked at any time under the Plan.

[3] According to a 2008 CBA between the Union and Pathmark, an undisputedly authentic portion of which is included in the record, Pathmark ceased participating in the Plan on October 1, 2008. A&P continued to make contributions to the Plan until July 19, 2015, and Pathmark's withdrawal did not affect Plaintiff's accumulation of benefits under the Plan because, as of October 1, 2008, "covered participants of [Pathmark]"—such as Plaintiff— "beg[a]n accruing . . . service benefits [under the Plan pursuant] to the A&P Pension Plan."

3

currently working as an assistant bakery manager at Giant. In a letter dated September 1, 2015, the Board informed Plaintiff that he was not eligible to receive early retirement benefits because "[y]ou are currently considered to be working in disqualifying employment" defined as "work either in covered employment, or in the same or related industry or craft under which the RWDSU has jurisdiction, or work in the same industry in which you earned your retirement."

On September 9, 2015, Plaintiff appealed the eligibility determination. In a letter dated October 8, 2015, the Board denied the appeal, explaining: "The work that you described at your current employer [Giant] is disqualifying under the current Plan Rules."

In July 2017, Plaintiff submitted a second application—this time for normal retirement benefits effective as of his sixty-fifth birthday, August 28, 2017. Again, Plaintiff indicated that he worked at Giant as an assistant bakery manager. In a letter dated July 26, 2017, the Board denied Plaintiff's second application, explaining that "[t]he work that you described at your current employer is disqualifying under current Plan Rules," and that "[y]ou, therefore will not be eligible to receive your retirement benefits at this time."

On September 16, 2017, Plaintiff appealed the second denial. In his appeal letter, Plaintiff's counsel also requested various documents, including "[t]he collective bargaining agreements, trust agreements and all other agreements to which A&P is/was a party that obligated A&P to make employee benefit contributions to the RWDSU Pension Funds[.]" Plaintiff repeated his request for the documents in a letter to the Board dated October 12, 2017.

On October 20, 2017, the Board responded to Plaintiff's request, providing various documents related to the Plan. The Board did not, however, provide a copy of the A&P CBAs, explaining that "[t]he [Plan] does not maintain copies of collective bargaining agreements." Finally, the letter noted that the Board would be addressing Plaintiff's appeal at their next

4

meeting in November 2017.

On October 31, 2017, Plaintiff's counsel again requested a copy of the CBAs that governed A&P's contribution to the Plan. The Board responded on November 8, reiterating that "the [Plan] does not have copies of the collective bargaining agreement."

The Board considered Plaintiff's second appeal at its November 14-17, 2017 meeting. After discussing Plaintiff's application, the Board determined that "the prior analysis of this participant's eligibility does not change under the Plan terms based on the fact that the participant has now reached Normal Retirement Age," and denied his appeal. In a letter dated December 4, 2017 but postmarked January 2, 2018, the Board informed Plaintiff that it had denied his second appeal. The Board explained: "Mr. Cohen's application for a Normal Pension was denied . . . due to his work in 'disqualifying employment' within the meaning of the Plan . . . . Upon Mr. Cohen's cessation of work in disqualifying employment, he will be entitled to commence his pension in accordance with the Plan's terms." Plaintiff continues to work at Giant to this day.

On April 5, 2018, Plaintiff initiated this action. Now pending are the parties' cross motions for summary judgment.

**III.     Discussion**

As all parties agree, the Pension Plan, and Plaintiff's coverage thereunder, is governed by ERISA. *See* 29 U.S.C. § 1003 (defining ERISA's coverage). "Congress enacted ERISA 'to ensure the proper administration of pension and welfare plans, both during the years of the employee's active service and in his or her retirement years.'" *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 81-82 (3d Cir. 2012) (quoting *Boggs v. Boggs,* 520 U.S. 833, 839 (1997)). "To this end, the statute . . . sets forth detailed disclosure and reporting obligations for plans . . . imposes

various participation, vesting, and funding requirements [and] prescribes standards of conduct for plan fiduciaries." *Id*.

ERISA also "creates a civil cause of action for a plan participant." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012) (citing 29 U.S.C. § 1132). Section 1132(a)(1) provides that a plan participant may bring a civil action either (1) "to recover benefits due to him under the terms of his plan," or (2) to enforce ERISA's disclosure requirements. *See* 29 U.S.C. § 1132(a)(1)(A)-(B). Here, Plaintiff brings claims under both prongs of Section 1132(a)(1), arguing Defendants violated the strictures of ERISA by improperly denying his applications for retirement benefits, and by failing to produce the CBAs that governed A&P's obligations under the Plan.

### A. Improper Suspension of Early & Normal Retirement Benefits

ERISA is famously "complex," *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 312 (3d Cir. 2011), but resolving Plaintiff's claims for early and normal retirement benefits is straightforward: Plaintiff applied for retirement benefits when he was not in fact retired, and the Board denied his applications accordingly. Nothing about that violated ERISA.

To prevail on a denial of benefits challenge under Section 1132(a)(1)(B), "a plan participant must demonstrate that he or she has a right to benefits that is legally enforceable against the plan and that the plan administrator improperly denied those benefits." *Fleisher*, 679 F.3d at 121 (internal quotation marks omitted). "[A] denial of benefits challenge under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In such circumstances, "a deferential standard of review [is] appropriate," *id*. at 111,

requiring that a court review the administrator's "interpretations," "factual findings," and "denial of benefits under an arbitrary and capricious standard." *Fleisher*, 679 F.3d at 120-21 (internal quotations and citations omitted). "An administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* at 121 (internal quotation marks omitted).

Here, as Plaintiff concedes, the Trust Agreement grants the Board broad discretionary authority to determine eligibility and interpret the Plan's term. Accordingly, the Board's interpretations, factual findings, and eligibility determinations will be upheld unless arbitrary and capricious. Applying that "deferential standard," the Board's denial of early and normal retirement benefits was not arbitrary and capricious because Plaintiff's continued employment at Giant—that is, the fact that he was not actually retired—rendered Plaintiff ineligible for retirement benefits under the Plan.

### 1. Application for Early Retirement Benefits

"Early retirement benefits are . . . benefits that become available upon retirement at or after a specified age which is below the normal retirement age," *Bellas v. CBS, Inc.*, 221 F.3d 517, 527 (3d Cir. 2000) (quoting *Ross v. Pension Plan for Hourly Employees of SFK Indus., Inc.*, 847 F.2d 329, 333 (6th Cir. 1988))—the "normal retirement age" being sixty-five for purposes of ERISA, 29 U.S.C. § 1002(24). Early retirement benefits may be suspended where early retirees return to work: "A plan may provide for the suspension of pension benefits which commence prior to the attainment of normal retirement age . . . for any reemployment." 29 C.F.R. § 2530.203-3.

Here, the Plan contained a reemployment suspension clause for early retirement benefits: "[M]onthly benefit shall be suspended for any month in which the Participant is employed in

7

Disqualifying Employment before he has attained Normal Retirement Age." The Plan defined "Disqualifying Employment" to include "employment with any employer or self-employment in the same or related business in the same geographic area as any Employer contributing to the [Plan]."[4]

As it explained in its September 1, 2015 letter, the Board concluded that Plaintiff's employment with Giant constituted "Disqualifying Employment" because, as a supermarket, Giant was in the same business as other employers that contributed to the Plan, namely other supermarkets. According to the Board, Plaintiff was ineligible for early retirement benefits because he ran afoul of the Plan's early retirement reemployment suspension clause.

The Board's decision was not arbitrary and capricious. Plaintiff does not challenge the factual basis of the Board's decision, namely that he worked for Giant and that Giant was in the same or related business as another employer that contributed to the Plan. Further, the decision was consistent with the plain language of the Plan's reemployment suspension clause—a provision expressly permitted under relevant ERISA regulations. *See* 29 C.F.R. § 2530.203-3. Thus, Plaintiff's challenge to the Board's denial of his early retirement benefits fails.

**2. Application for Normal Retirement Benefits**

A similar analysis applies to the Board's decision to deny Plaintiff's application for normal retirement benefits. Normal retirement benefits are those benefits that become available when a plan participant reaches the normal retirement age, again, sixty-five. *See* 29 U.S.C. §§ 1002(22)-(24). While generally "an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age," 29 U.S.C. § 1053(a), ERISA provides a limited exception to this rule of nonforfeitability "if the pensioner returns to work in the same industry, trade, and geographic area." *Geib v. New York State Teamsters Conference*

---
[4] For the full statutory language *see supra* note 2.

*Pension & Ret. Fund*, 758 F.2d 973, 975 (3d Cir. 1985) (citing 29 U.S.C. § 1053(a)(3)(B)(ii)). As the Supreme Court has explained: "In authorizing such suspensions, Congress seems to have been motivated at least in part by a desire 'to protect participants against their pension plan being used, in effect, to subsidize low-wage employers who hire plan retirees to compete with, and undercut the wages and working conditions of employees covered by the plan.'" *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 742 n.1 (2004) (quoting 120 Cong. Rec. 29930 (1974) (statement of Sen. Williams regarding Section 203(a)(3)(B))).

The Pension Plan contained a normal retirement reemployment suspension clause that mirrors the language of the ERISA exception. Normal retirement benefits "shall be suspended for any month in which he worked or was paid for at least 40 hours in Totally Disqualifying Employment," defined as employment:

> (1) in an industry covered by the Plan when the Participant's pension payments began; and (2) in the jurisdiction of the Union when the Participant's pension began; and (3) in the same trade or craft or any occupation in which the Participant worked at any time under the Plan.[5]

Here, in its July 26, 2017 letter, the Board informed Plaintiff that he was not eligible for normal retirement benefits because "[t]he work that you described at your current employer is disqualifying under current Plan Rules." In a follow up letter, the Board elaborated:

> The Board has determined that it must deny Mr. Cohen's appeal. . . . Specifically, the Board's understanding is that Mr. Cohen works at least 40 hours per month in disqualifying employment (i.e., employment in an industry covered by the Plan, in the jurisdiction of the Union, and in the same trade, craft or occupation in which he worked under the Plan).

Again, nothing about the Board's decision was arbitrary and capricious. Plaintiff does not challenge the factual basis of the Board's decision—that is, Plaintiff does not dispute that he did, in fact, work forty hours per month for Giant, and that his work with Giant was in the same

---

[5] Again, for the full statutory language *see supra* note 2.

"industry, trade, and geographic area" as his previous employment. *Geib*, 758 F.2d at 975. Further, the Board's decision was reasonable: It followed the Plan's clear language regarding the suspension of normal retirement benefits, an exception to the general rule of nonforfeitability expressly permitted by ERISA. 29 U.S.C. § 1053(a). Accordingly, Plaintiff's challenge to the Board's denial of his application for normal retirement benefits also fails.

### 3. Plaintiff's Counterarguments

Plaintiff offers little in response to the above analysis. Instead, he contends that the Board's decisions were arbitrary and capricious for altogether different reasons. As discussed below, those reasons, both individually and taken together, are unavailing because the Board's denial of Plaintiff's application was based on the straightforward application of the Plan's language, which prevented Plaintiff from collecting retirement benefits when he was not actually retired.

#### a. A&P's Bankruptcy

Plaintiff asserts that the Board failed to adequately take into consideration A&P's 2015 bankruptcy. The gist of Plaintiff's position is that reemployment suspension clauses—like those in the Plan—are intended to protect the former employer against competition from the new employer; that A&P's 2015 bankruptcy rendered that purpose moot, as there were no A&P stores left to compete with; and, thus the Board's reliance on the reemployment suspension clauses rendered its decisions arbitrary and capricious.

Plaintiff's argument fails, however, because it is premised on a misunderstanding of the purpose served by reemployment suspension clauses. As the Supreme Court has explained, such clauses protect "*employees* covered by the plan" against unfair competition and wage suppression. *Heinz*, 541 U.S. at 742 n.1 (2004) (internal quotation marks omitted and emphasis

added); the clauses do not protect *employers* from competition.[6] In fact, when presented with this precise argument, a district court in this Circuit rejected it: "We disagree with plaintiffs' contention that [a reemployment suspension] rule was intended to prohibit competition with the former employer." *Dennis v. Bd. of Trustees of Food Employers Labor Relations Ass'n & United Food & Commercial Workers Union Pension Fund*, 620 F. Supp. 572, 575 (M.D. Pa. 1985).

Contrary to Plaintiff's contention, then, the purpose of the Plan's reemployment suspension clauses was not to protect the former employer—Pathmark and/or A&P—from competition. Indeed, the facts of this case demonstrate how the Plan's reemployment suspension clauses continued to serve their intended purpose even after A&P's bankruptcy: If Plaintiff were allowed to collect retirement benefits under the Plan in addition to his wages from Giant, that would, in effect, subsidize Giant's low-wage hiring practices and suppress wages for other Plan participants—such as, for example, other former-Pathmark employees seeking employment in the supermarket industry. Thus, nothing about A&P's bankruptcy made the Board's invocation of the reemployment suspension clauses arbitrary and capricious.[7]

### b. The Board's Structural Conflict

Next, Plaintiff argues that the Board's determinations were arbitrary and capricious because of its structural conflict of interest. A conflict exists where "a plan administrator both

---

[6] The only case Plaintiff cites for the proposition that the purpose of reemployment suspension clauses is to prohibit competition with the former employer, *Brower v. Comark Merch., Inc.*, 949 F. Supp. 1183 (D.N.J. 1996), is not to the contrary as that case did not concern reemployment suspension clauses. Instead, *Brower* concerned an entirely different type of forfeiture clause—a non-competition forfeiture clause. But non-competition forfeiture clauses and reemployment suspension clauses are distinct provisions that are premised on different parts of ERISA and serve different purposes. Accordingly, *Brower*'s conclusions about the purpose of non-competition clauses simply do not bear on the issue presented here.

[7] To the degree Plaintiff's claims are based on Pathmark's decision to cease participating in the Fund, the same analysis applies. That Pathmark no longer contributed to the fund after 2008 has no bearing on whether the Plan maintained an interest in enforcing the reemployment suspension clauses because the purpose of said clauses is not to protect the former employer—whether Pathmark or A&P—from subsequent competition.

evaluates claims and pays benefits claims." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). It is well settled, however, that "the mere existence of a conflict is not determinative," *Dowling v. Pension Plan For Salaried Employees of Union Pac. Corp. & Affiliates*, 871 F.3d 239, 250 (3d Cir. 2017), *cert. denied,* 138 S.Ct. 1032 (2018), because such conflicts are "a common feature of ERISA plans" as "the lion's share of ERISA plan claims denials are made by administrators that both evaluate and pay claims." *Glenn*, 554 U.S. at 121 (Roberts, CJ., concurring) (internal quotation marks omitted). Instead, "a conflict should be weighed as a factor in determining whether there is an abuse of discretion." *Glenn*, 554 U.S. at 116. As the Third Circuit has explained, "we have only been willing to disturb an administrator's decision based on a conflict of interest if evidence either suggests the conflict actually infected the decisionmaking or if the conflict is one last straw that calls a benefits determination into question." *Dowling*, 871 F.3d at 251.

Here, a structural conflict existed because the Board both evaluated and paid benefits claims. But, the mere existence of the conflict does not doom the Board's decisions here where there is no evidence in the record that the conflict "actually infected the decisionmaking" of the Board, nor was the conflict "one last straw" calling the Board's decision into doubt. As discussed, the Board's decisions were based on the straightforward application of the Plan's language that prohibited Plaintiff from collecting retirement benefits before he actually retired.

  **c. Procedural Violations**

Finally, Plaintiff argues that the Board's failure to adhere to the procedural requirements of ERISA rendered its determinations arbitrary and capricious. "[A]lleged procedural errors . . . are factors to consider in determining if the plan administrator's interpretation was reasonable." *Becknell v. Severance Pay Plan of Johnson & Johnson & U.S. Affiliated Companies*, 644 F.

App'x 205, 213 (3d Cir. 2016) (citing *Weitzenkamp v. Unum Life Ins. Co. of Am.*, 661 F.3d 323, 329 (7th Cir. 2011)). Plaintiff complains of two procedural violations, namely that the Board (1) provided untimely notice of its decision to deny his appeal for normal retirement benefits, and (2) failed to produce the CBAs that governed A&P's obligations under the Plan.

As to the untimely notice, Defendants concede that the Board informed Plaintiff of the denial of his appeal for normal retirement benefits in an untimely manner, violating the ERISA regulation governing notice of benefit determinations. *See* 29 C.F.R. § 2560.503-1(i). But, as the Third Circuit has explained, a "late decision does not rise to the level of a severe procedural violation," of the type that renders a decision arbitrary and capricious. *Becknell*, 644 F. App'x at 213. As was the case in *Becknell*, the Board's decision "mirror[ed] the [initial] denial, and relie[d] on the same prior decisions interpreting the issue, underscor[ing] the consistency of the [Board's] exercise of discretion in this matter." *Id.* Moreover, Plaintiff "advances no reason that the [Board's] delayed response prejudiced or otherwise harmed his appeal," given that Plaintiff "received a timely denial in response to his initial request for [normal retirement] benefits," and thus "was apprised of the [Board's] exercise of its discretion well before he instituted the present litigation." *Id.* at 212. Accordingly, without "summarily dismiss[ing] the possible impact of the [Board's] tardiness in issuing its decision," the Board's determination was not arbitrary and capricious because of the untimely notice, when that determination was based on the application of the Plan's clear language.

The same is true of the Board's failure to produce the A&P CBAs. As discussed more fully below, the failure to produce those documents violated the disclosure requirements of Sections 1024(b)(4) and 1132(c). *See* 29 U.S.C. § 102(b)(4), 1132(c); *infra* Section II.B. Nevertheless, the failure to produce the A&P CBAs did not amount to a "serious procedural

13

violation" which would make the decisions unreasonable. *Becknell*, 644 F. App'x at 213. The Board explained to Plaintiff that he was ineligible for early and normal retirement benefits based on the reemployment suspension provisions contained in the Trust Agreement, a copy of which was provided to him. Plaintiff "was apprised of the [Board's] exercise of its discretion well before he instituted the present litigation." *Id*. Thus, the Board's failure to produce the CBAs did not transform its decision into an abuse of discretion, given that the plain terms of the Plan's reemployment suspension clauses made Plaintiff ineligible for early and normal retirement benefits due to his employment at Giant.

In sum, the Board acted reasonably in denying Plaintiff's applications for early and normal retirement benefits. Accordingly, Plaintiff's challenges to the Board's denials fail.

### B. Failure to Produce CBAs

Separately, Plaintiff seeks a document penalty for the Board's failure to produce the A&P CBAs. Section 1132(c) "gives courts discretion to impose a monetary penalty on retirement plan administrators who fail to provide plan beneficiaries with . . . information that it is required to provide by the provisions of Subchapter I of ERISA." *Galman v. Sysco Food Servs. of Metro New York LLC*, 674 F. App'x 211, 213 (3d Cir. 2016) (citing 29 U.S.C. §§ 1001-1145).[8] Section 1024(b)(4), in turn, requires that "upon written request of any participant or beneficiary," a plan administrator must "furnish a copy of the latest updated summary, plan description, and the latest

---

[8] In full, Section 1132(c) states:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c). In addition, the daily maximum penalty was increased by regulation to $110. *See* 29 C.F.R. § 2575.502c-1.

annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). Thus, the failure to produce documents in accordance with Section 1024(b)(4) opens the administrator to liability per Section 1132(c).

Here, the Board's failure to produce the CBAs constituted a violation of Section 1024(b)(4). Plaintiff requested a copy of, *inter alia*, "[t]he collective bargaining agreements, trust agreements and all other agreements to which A&P is/was a party that obligated A&P to make employee benefit contributions to the RWDSU Pension Funds." Although the Board produced other requested documents, it has yet to produce any such CBAs—some eighteen months after the initial request.

And, critically, the CBAs negotiated between the Union and the contributing employers fall under the ambit of Section 1024(b)(4). The Trust Agreement provides that "[a]ny Employer may participate in the Trust and the Plan by [e]xecuting a copy of a Collective Bargaining Agreement[,]" and that "[b]y executing or complying with the terms of a Collective Bargaining Agreement each employer shall be deemed . . . to have" agreed to certain obligations, including "to comply with and be bound unconditionally to [the] Plan and Trust." Thus, under the Plan, CBAs are instruments that establish the Plan operates for each contributing employer. As for the A&P CBAs specifically, they are the documents that govern A&P's obligations under the Plan. Accordingly, the CBAs requested by Plaintiff were covered by Section 1024(b)(4), and the Board's failure to produce them constituted a violation of Section 1132(c).

Defendants advance two arguments as to why Section 1024(b)(4) does not cover the CBAs, neither of which is convincing. First, Defendants argue that the Trust Agreement, not the CBAs, established the Plan and dictated its operation, such that Section 1024(b)(4) required the

Board to produce the Trust Agreement only. It is true that Section 1024(b)(4) required the production of the Trust Agreement; however, because employer's obligations under the Plan are dictated by the CBAs, those documents also qualify as instruments under which the Plan operated. The language of the statute—speaking as it does in terms of plural "instruments" and not a single "instrument"—plainly contemplates that multiple documents may govern how the plan is "established or operated." Thus, Section 1024(B)(4) required production of the CBAs in addition to, rather than in lieu of, the Trust Agreement.

Second, Defendants argue that they cannot be held liable for failing to produce the CBAs because they do not have those documents. But, that the Defendants did not maintain copies of the CBAs does not absolve them from liability—"the statute makes no exception or qualification for failures caused by the *absence* of mandated documents." *Jackson v. E.J. Brach Corp.*, 937 F. Supp. 735, 740 (N.D. Ill. 1996). "If the rule were as defendant interprets it, it would be too easy for a plan administrator to avoid [Section 1132(c)] penalties simply by failing to maintain documents[.]" *Id.*; *cf. Cohen v. Gross, Sklar & Metzger, P.C.*, 1992 WL 38387, at *6 (E.D. Pa. Feb. 25, 1992) ("The plaintiffs requested a specific type of document . . . explicitly required to be produced by the administrator of a benefit plan under Section 1024(b)(4). [The administrator] was not authorized under ERISA to respond to this request with documents that it believed were equivalent or that it thought would provide the plaintiffs with comparable information. Allowing such a response would vitiate the intricate disclosure provisions of ERISA, which require the production of specific types of documents and information, as administrators could respond to document requests with whatever information they chose.").

The only remaining question then is what, if any, penalty should be imposed on Defendants for failing to produce the CBAs. The Third Circuit has instructed that, in

determining whether to impose sanctions for a violation of Section 1132(c), "appropriate factors to be considered . . . include 'bad faith or intentional conduct on the part of the administrator, the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to the participant or beneficiary.'" *Romero v. SmithKline Beecham*, 309 F.3d 113, 120 (3d Cir. 2002) (quoting *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 90 (2d Cir. 2001)).

The factors point in competing directions here. On the one hand, there is no indication that Defendant acted in bad faith in failing to produce the CBAs. Although Plaintiff asserts that Defendants had the CBAs and simply failed to produce them, nothing in the record supports those conclusory allegations. On the other hand, Plaintiff requested the CBAs several times, and the delay in the producing those documents—over eighteen months and counting—has been substantial, which weighs in favor of imposing a document penalty on Defendants.

Whether a penalty should be imposed, then, turns on the prejudice Plaintiff suffered from Defendants' non-production. As discussed above, Defendants denied Plaintiff's applications for early and normal retirement benefits based on the reemployment suspension clauses contained in the Trust Agreement, a copy of which was provided to Plaintiff. In this litigation, Plaintiff has failed to explain how anything in the CBAs would alter the Board's eligibility determinations. That is not surprising—the CBAs governed employers' obligations to the Plan, not the Plan's obligations to plan participants.

And yet, it is unclear if Plaintiff could have fully understood that prior to the initiation of the suit given Defendants' non-production. Thus, Plaintiff was prejudiced—if not dramatically so—up until the point that this litigation began. After the initiation of this suit, however, that prejudice dissipated because Plaintiff had access to the tools of discovery as set forth in the

17

Federal Rules of Civil Procedure and could have used those tools to obtain copies of the CBAs via third-party subpoenas.

The Court therefore concludes that a limited document penalty should be imposed on Defendants, and that penalty should be in the amount of $16,700. That figure is derived from applying the per diem statutory penalty of $100 to the one hundred and sixty-seven days that elapsed from the Board's initial failure to produce the CBAs to the start of this litigation—from October 20, 2017, when the Board sent its first response to Plaintiff's request for the CBAs, to April 5, 2018, when Plaintiff initiated this action. Before April 5, Plaintiff had no means to compel the CBAs production, but from that date onwards he could have used the tools of discovery to do so. Thus, the Court finds the imposition of a document penalty in the amount of $16,700 fairly compensates Plaintiff for the injury suffered from Defendant's violation of Section 1132(c).

An appropriate order follows.

**June 3, 2019**                                         **BY THE COURT:**

                                                              **/s/Wendy Beetlestone, J.**

                                                              **WENDY BEETLESTONE, J.**